FERENCY v SECRETARY OF STATE

Docket Nos. 65764, 65765, 65882. Argued September 12, 1980 (Calendar No. 1). Submitted on briefs September 30, 1980 (Calendar No. 2).—Calendar No. 1 decided September 12, 1980. Calendar No. 2 decided, and opinions in both filed, October 3, 1980.

Calendar No. 1. Zolton Ferency brought an action for mandamus against the Secretary of State, the Director of the Elections Division of the Department of State, and the Board of State Canvassers, claiming that the initiative petitions to amend the Constitution filed by Tisch Coalition for Property Tax Cut in Michigan, Inc. (the "Tisch" proposal to limit taxation), were defective because they did not set forth all provisions of the Constitution which the proposal would alter or abrogate, as required by the Election Law, and that the proposal should not be put on the ballot. The Tisch Coalition for Property Tax Cut in Michigan, Inc., intervened as a defendant. The Ingham Circuit Court, James R. Giddings, J., granted judgment for the plaintiff and ordered that the proposal not be put on the ballot for the November, 1980, general election. The defendants and intervening defendant appealed prior to decision by the Court of Appeals.

Calendar No. 2. After the Supreme Court issued its order in the first case that the defendants proceed to place the proposed amendment on the ballot, Zolton Ferency brought an action for

REFERENCES FOR POINTS IN HEADNOTES

[1, 4, 5, 7, 35] 42 Am Jur 2d, Initiative and Referendum § 6.

Power of legislative body to amend, repeal, or abrogate initiative or referendum measure, or to enact measure defeated on referendum. 33 ALR2d 1118.

[2, 3] 42 Am Jur 2d, Initiative and Referendum § 3.

[4, 7, 19, 21-34] 42 Am Jur 2d, Initiative and Referendum § 44.

[6, 18, 30] 42 Am Jur 2d, Initiative and Referendum § 5.

[8] 16 Am Jur 2d (Rev), Constitutional Law § 1.

[9-12] 42 Am Jur 2d, Initiative and Referendum § 23.

[13] 42 Am Jur 2d, Initiative and Referendum §§ 22, 23.

[14, 16, 17] 42 Am Jur 2d, Initiative and Referendum §§ 33, 37.

[15] 42 Am Jur 2d, Initiative and Referendum § 47.

[20, 21] 42 Am Jur 2d, Initiative and Referendum § 48.

mandamus against the Secretary of State, the Director of the Elections Division, and the Board of State Canvassers, seeking an order that they publish a notice that the proposed amendment would alter or abrogate certain existing provisions of the Constitution. The Ingham Circuit Court, James R. Giddings, J., granted judgment for the plaintiff. The defendants appealed prior to decision by the Court of Appeals.

The Supreme Court issued two per curiam opinions, signed by all but Justice Williams, the first dealing with the sufficiency of the petitions and the second with the publication requirement. Justice Williams wrote a separate opinion concurring as to the petitions but dissenting as to publication. *Held:*

The petitions and the notice published by state officers both need only set forth constitutional provisions which would be altered or abrogated by the proposed amendment; an existing constitutional provision is altered or abrogated if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative. The burdens imposed by the Election Law have been met. The defendants are ordered to proceed forthwith to attend to the duties prescribed by the Constitution and statute.

### Petitions

1. The right of qualified voters of the state to propose amendments to the Constitution by petition can be interfered with neither by the Legislature, the courts, nor the officers charged with any duty in the premises. But the right is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution. The constitutional section which provides for the exercise of the right of popular amendment and describes the conditions imposed on that right is self-executing—it does not depend upon statutory implementation. Legislation supplementary to a self-executing constitutional provision may not curtail or place any undue burdens on the right guaranteed by the provision. The Constitution does not require that the petition set out existing provisions that will be altered or abrogated; it places the burden of publishing this information on the state, as a means of informing the voters. The Court has held that the *constitutional* requirement of publication by state officials of the provisions of the Constitution which would be altered or abrogated by a proposed amendment means that if the proposal amends or replaces a specific provision that provision must be published along with the proposal, but that other provisions which would be still opera-

tive, although possibly they may need to be construed in conjunction with the amending provision, need not necessarily be published. The *statutory* requirement that the *petition* list provisions of the Constitution that the proposed amendment would alter or abrogate must now be construed.

2. The Legislature, apparently feeling it proper to extend the educational function of the requirement of setting out existing provisions of the Constitution which will be altered or abrogated to persons signing petitions, has placed the burden on petitioners, allegedly pursuant to the constitutional provision that a petition shall be in the form, and signed and circulated in the manner, prescribed by law. Assuming, *arguendo,* that a new statutory requirement regarding substantive content is a regulation of form, and assuming that the Legislature can impose minimal burdens to keep the process fair, open, and informed, the burden imposed cannot unduly restrict the exercise of the right. In construing the burden placed on petitioners by the statute a court should be mindful that under a system of government based on grants of power from the people, constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed. Further, where, as here, there is doubt as to the meaning of legislation regulating the reserved right of initiative, that doubt is to be resolved in favor of the people's exercise of the right.

3. The Constitution is a broad, interrelated document composed largely of general principles of government rather than narrow, detailed requirements. The difficulty, if not impossibility, of assessing the effect of a proposed amendment on the existing Constitution is demonstrated by the history of this case. Ferency, himself an able attorney, identified at least seven constitutional provisions that would be altered by the proposed amendment. The circuit court identified at least five provisions, only one of which had been listed by Ferency. Doubtless, plausible arguments could be made that additional provisions will be altered. Correctly interpreting the Constitution to identify all provisions affected by a proposed amendment is too onerous a burden to place upon the right of popular amendment. Nor can it be justified as a means of educating persons signing petitions. A petitioner faced with the prospect of having an entire petition drive nullified by the failure to list a constitutional provision will, out of caution, err on the side of inclusion. Petitions will become a maze of constitutional provisions, if indeed petitioners will not simply attach copies of the entire Constitution to their petitions. The provisions expressly being amended may be lost among those less directly affected.

Few people will understand, without extensive explanation, how or how much a particular listed provision is being altered.

4. While virtually all of the existing constitutional provisions raised by the plaintiff and the circuit court will, to one degree or another, be affected by the proposed constitutional amendment, should it be adopted, it cannot be concluded that any of them would be "altered or abrogated". Only where the proposed amendment would directly "alter or abrogate" ("amend or replace") a specific provision or provisions of the existing Constitution must those provisions be noted on the petitions. An existing constitutional provision is altered or abrogated if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative.

5. Here the petitions which were circulated correctly notified the prospective signer of the provisions that the proposed amendment would "alter or abrogate". The provisions cited by the plaintiff and by the circuit court will remain operative, though possibly they may need thereafter to be construed in conjunction with the amending provisions. Since the petitions clearly specified those provisions which the proposed amendment would directly "alter or abrogate" if adopted, the requirements of the Election Law were met. A more expansive definition of the "alter or abrogate" requirement would effectively require a petition circulator, in order to insure against subsequent judicial nullification of the effort, to secure judicial determination of which provisions of the existing Constitution the proposed amendment would "alter or abrogate". It is not likely that such a state of affairs was contemplated by the Legislature in promulgating the statute.

6. The plaintiff argues that the controversy is moot because the Board of State Canvassers failed to certify the petition within 60 days of the general election as required by the Constitution and the Election Law. The circulators of the petitions in this case complied with constitutional dictates in filing the petitions. The defendant Board of State Canvassers attempted to fulfill its constitutional duties to certify them in a timely fashion, but was prohibited from doing so by an order of the circuit court. It would be manifestly unfair to hold that because the deadline has passed the Court can afford no relief. Such a decision would encourage opponents of a proposal to try to keep it off the ballot by waiting until the last minute to challenge it. The Court cannot tolerate such a misuse of the judicial process.

7. The 60-day requirement for the certification of the pro-

posed amendment does not relate to the sufficiency or validity of the petitions themselves. It is designed essentially to facilitate the electoral process by giving the Secretary of State and county clerks enough time to print and distribute ballots, and to ready the voting machinery for election day. It should not be used to prevent a proposal from appearing on the ballot where its proponents have done everything the Constitution requires of them, and only the most extreme circumstances, the last-minute judicial intervention in this case, prevented the timely certification of the petition. The courts, in a long line of cases, have actively protected and enhanced the initiative and referendum power; constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed and their exercise should be facilitated rather than restricted. Under the circumstances of this case, the expiration of the 60-day deadline does not preclude the certification of the proposed amendment.

*Publication*

8. The Constitution requires the Secretary of State to publish those provisions of the existing Constitution which the proposed amendment would, if adopted, "alter or abrogate". For the same reasons that the circuit court erred in finding the petitions "insufficient", it erred in issuing its order requiring the publication of certain additional provisions of the Constitution. The petitions specified all of the provisions which the proposed amendment would directly "alter or abrogate", if adopted. The difficulty of determining which provisions will be altered is the same for the state as for the petitioner. The risk that the voter will be confused by overinclusion and will lose sight of the provisions being directly amended among those indirectly affected are at least as great on a publication posted at the polls as on a petition. To construe the phrase "altered or abrogated" more broadly in constitutional context would inject a degree of uncertainty into the constitutional amendment process which could only be resolved by the Court. Because the Constitution is a cohesive document whose underlying principles and constituent parts are interrelated, proposed amendments are likely to affect the operation of a number of existing provisions. The more emphasis is placed on resolving doubts in favor of inclusion, the more diluted the informational effect of the publication will become. Given the breadth and generality of our Constitution and the interrelation of its provisions, it is difficult to see how an assessment of a proposed amendment's effect could be definitively resolved short of an appeal to the Supreme Court.

9. It is hardly proper or practical for the Court to issue

advisory opinions on the constitutional implications of every proposed amendment. The people, in reserving to themselves the power to amend their Constitution through a self-executing process, cannot have intended to require state election officials to make complex judgments which would require judicial imprimatur in order to establish that the election officials had properly performed their duties under the Constitution. The reasonable interpretation of what the people intended in requiring publication of the constitutional provisions that would be altered or abrogated by a proposed amendment is that the requirement contemplates the purely ministerial task of setting out the provisions expressly being altered. The state has the same narrow publishing requirements as the petitioner. An existing constitutional provision is altered or abrogated if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative.

Reversed.

Justice Williams agreed that the initiative petition in this case need not state or insert any existing provision of the Constitution beyond those already stated and inserted, but would hold that there are different standards for determining whether a petition to be circulated and a proposed amendment to be published and put on the ballot contain provisions which would alter or abrogate provisions of the existing Constitution. The Secretary of State, the Director of Elections, and the Board of State Canvassers have a duty independent of that of the petition circulator to determine whether in the proposed amendment there are provisions which would "alter or abrogate" sections of the existing Constitution. Further, the proposed amendment does "alter or abrogate" provisions of the Constitution beyond those stated in the petition, and those provisions should be published.

1. The framers of the Constitution wanted to make the process of initiative and referendum as freely available as possible, but they also wanted voters to have reasonable notice of the effect of a proposed initiative or referendum on existing provisions of the Constitution. If an average citizen without access to skilled legal counsel wishing to circulate an initiative or referendum petition had to supply exhaustive notice to inform a voter definitively, it could well have a chilling effect on the exercise of the right of initiative or referendum. The framers of the Constitution did not want to do that, but they did want the people to have sufficient notice and information in order to exercise a proper judgment in voting. Comparison of

the constitutional provisions for circulation of petitions and publication of proposed amendments makes it clear that the Constitution intended that for the circulation of a petition there should be a certain standard as to form and signature; but for the publication of the proposed amendment a higher standard could be exacted, because this duty was to be performed by public officials with a particular competence in the matter. The petition circulator is confronted with a much easier standard than that imposed upon the public officials. This would give the citizen the requisite information when it was most important, when he voted.

2. The statute relating to petitions uses the same "alter or abrogate" language as that found in the Constitution relating to publication of the proposed amendment. The Court should not ascribe to the Legislature an intention in the Election Law to shift the duty of authoritative determination whether the proposed amendment "alters or abrogates" provisions of the Constitution from the constitutionally designated election officials to the petition circulator. To do so would be to conclude more than the statutory words imply. Legislation should not be lightly construed to change the Constitution. The appropriate election officials have the duty under the Constitution to determine whether the proposed amendment "alters or abrogates" provisions of the existing Constitution. The statute cannot be construed to impose the same duty on the circulator as the Constitution imposes upon election officials in publication. While the Election Law has the same words, "alter or abrogate", used in the Constitution, the Legislature was using them in a different context and they should be interpreted in that different context.

3. The reason for the constitutional publication requirement is to inform the voter so he can vote intelligently on the referendum. To avoid confusion there need not be publication of all the other constitutional provisions which might be remotely or contingently affected, but if the proposed provision amends or replaces a specific provision, that provision should be published. Other provisions which are still operative but which may need to be construed in conjunction with the amendatory provision need not necessarily be published. Precedent encourages the Court to use "different eyeglasses" before election from those it would use when sitting after an election. This probably means that the Court should 1) pay more attention to the intended purpose of publication, 2) credit the voter with more competence to cope with a number of altered provisions, 3) lean toward publication if there is any doubt whether

a provision "amends or replaces", "alters or abrogates", 4) lean toward publication if there is any doubt whether a still operative provision should be published.

4. The proposed amendment modifies the constitutional rule that approval in a referendum is by a majority by requiring a 60% vote where a new or increased tax is involved. It is important for the voter to know that in all other instances if there is a referendum the voters can speak by a majority rather than a 60% vote. The voter would not be confused by reference to six constitutional provisions which the proposed amendment would affect. Certainly any normal understanding of the terms "alter or abrogate" would indicate that the proposed amendment would do so by effectively inserting in a tax matter an exception of a 60% vote to the rule of a simple majority. Whether the alteration or amendment is direct or by implication makes no difference because the purpose of these terms is to lay the foundation for giving the electors the necessary information. In case of doubt whether the modification is an "amendment", the Court should lean toward publication.

5. In this case, the electoral time table requires the Court to speak now or never. Since the parties, consciously or unconsciously, have considered the question from the constitutional standpoint of the publication provision, it is in the public interest for the Court to consider the broader issue so that those going to the polling booths may be informed.

6. The revolutionary intent and purpose of the "Tisch" proposal is best stated by its sponsor, Robert Tisch, who does not say that the proposal would merely change the tax provisions of the Michigan Constitution but that it would have "a significant impact upon the operative affect *[sic]* of our form of government". In analyzing this case the Court ignores Tisch's language at its peril; the amendment does impact the form of government, not merely the constitutional taxing power. The amendment would change the current constitutional provisions for initiative and referendum by denying the people the significant right to approve a new tax or increase an old one by a majority. It is not the office of the Court to comment as to the wisdom of a policy of requiring an election by a 60% vote as opposed to a majority vote, but it is clearly the office of the Court to determine whether the change is an "alteration or abrogation" of the existing Constitution that must be brought to the attention of the people deciding to adopt a proposed amendment. Taking away the right of the majority to exercise

their will by initiative and referendum clearly would be an "alteration or abrogation" of the existing Constitution.

7. The Constitution vests the legislative power, including the power to tax, in the Legislature. However, the proposed amendment prohibits the Legislature from exercising that power in certain instances without affirmance by 60% of the electors. Clearly, the proposal alters or abrogates a fundamental existing provision of the Constitution. Furthermore, the constitutional procedure for enacting legislation would be changed by the additional step of affirmance by the voters whenever the bill involves imposition of new taxes or changes in the taxes extant in 1978. The proposal would essentially write in a limitational phrase, curtailing the operation of the enactment provision where tax matters are concerned; therefore, the enactment provision must be published. It is also obvious that the proposed amendment "alters or abrogates" the constitutional provision for the imposition of an excise tax on liquor sales by the Legislature by requiring approval by the voters for a new or increased excise tax. Requiring approval by 60% of the voters in a referendum on such tax legislation would also render inoperable the existing provision of the Constitution concerning the effective date of legislative enactment. Therefore, those provisions should also be published.

8. The proposed amendment includes a novel and extensive definition of a "tax" but it requires "affirmation" only for new or increased taxes which are enacted by the Legislature. It is therefore erroneous to argue that provisions of the Constitution which, owing to the broadened definition of "tax", would potentially involve impositions of taxes by other bodies are altered or abrogated. It would strain logic and the electoral system to find that the amendment would apply to municipal corporations merely because their power to "tax" was originally derived from the Legislature. Therefore, the proposed amendment does not "alter or abrogate" constitutional provisions concerning university controlling boards, judicial power, counties, cities or villages.

### OPINION OF THE COURT

1. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE.

The right of qualified voters of the state to propose amendments to the Constitution by petition can be interfered with neither by the Legislature, the courts, nor the officers charged with any duty in the premises; but the right is to be exercised in a certain way and according to certain conditions, the limitations

upon its exercise, like the reservation of the right itself, being found in the Constitution (Const 1963, art 12, § 2).

2. Eʟᴇᴄᴛɪᴏɴs — Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Iɴɪᴛɪᴀᴛɪᴠᴇ.

The constitutional section which provides for the exercise of the right of popular amendment of the Constitution and describes the conditions imposed on that right is self-executing; it does not depend upon statutory implementation (Const 1963, art 12, § 2).

3. Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Sᴇʟꜰ-Exᴇᴄᴜᴛɪɴɢ Pʀᴏᴠɪsɪᴏɴs — Sᴛᴀᴛᴜᴛᴇs.

Legislation supplementary to a self-executing constitutional provision may not curtail or place any undue burdens on the right guaranteed by the provision.

4. Eʟᴇᴄᴛɪᴏɴs — Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Iɴɪᴛɪᴀᴛɪᴠᴇ — Pᴇᴛɪᴛɪᴏɴs.

The Constitution does not require that a petition proposing an amendment to the Constitution set out existing provisions that will be altered or abrogated; it places the burden of publishing this information on the state, as a means of informing the voters (Const 1963, art 12, § 2).

5. Eʟᴇᴄᴛɪᴏɴs — Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Iɴɪᴛɪᴀᴛɪᴠᴇ — Pᴇᴛɪᴛɪᴏɴs — Eʟᴇᴄᴛɪᴏɴ Lᴀᴡ.

The Legislature has placed the burden on petitioners proposing an amendment to the Constitution to set out existing provisions that will be altered or abrogated; assuming, arguendo, that this new requirement of the Election Law regarding substantive content is a regulation of the form of the petitions, and assuming that the Legislature can impose minimal burdens to keep the process fair, open, and informed, the burden imposed cannot unduly restrict the exercise of the right (Const 1963, art 12, § 2; MCL 168.482; MSA 6.1482).

6. Eʟᴇᴄᴛɪᴏɴs — Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Iɴɪᴛɪᴀᴛɪᴠᴇ — Pᴇᴛɪᴛɪᴏɴs — Eʟᴇᴄᴛɪᴏɴ Lᴀᴡ.

Under a system of government based on grants of power from the people, constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed; further, where there is doubt as to the meaning of legislation regulating the reserved right of initiative, that doubt is to be resolved in favor of the people's exercise of the right (Const 1963, art 12, § 2; MCL 168.482; MSA 6.1482).

7. Eʟᴇᴄᴛɪᴏɴs — Cᴏɴsᴛɪᴛᴜᴛɪᴏɴᴀʟ Lᴀᴡ — Iɴɪᴛɪᴀᴛɪᴠᴇ — Pᴜʙʟɪᴄᴀᴛɪᴏɴ — Wᴏʀᴅs ᴀɴᴅ Pʜʀᴀsᴇs — "Aʟᴛᴇʀ ᴏʀ Aʙʀᴏɢᴀᴛᴇ".

The constitutional requirement of publication by state officials of

the provisions of the Constitution which would be altered or abrogated by a proposed amendment to the Constitution means that if the proposal amends or replaces a specific provision that provision must be published along with the proposal, but that other provisions which would be still operative, although possibly they may need to be construed in conjunction with the amending provision, need not necessarily be published (Const 1963, art 12, § 2).

8. CONSTITUTIONAL LAW — AMENDMENTS.

The Constitution is a broad, interrelated document composed largely of general principles of government rather than narrow, detailed requirements; it is difficult, if not impossible, to assess the effect of a proposed amendment on the existing Constitution.

9. ELECTIONS — INITIATIVE — PETITIONS.

A construction of the Election Law as conditioning the right of initiating a proposal to amend the Constitution upon correctly interpreting the Constitution to identify all provisions affected by a proposed amendment is too onerous a burden to place upon the right of popular amendment (MCL 168.482; MSA 6.1482).

10. ELECTIONS — INITIATIVE — PETITIONS.

A requirement that a petitioner proposing an amendment to the Constitution identify all provisions affected by the proposed amendment cannot be justified as a means of educating persons signing petitions because a petitioner faced with the prospect of having an entire petition drive nullified by the failure to list a constitutional provision will, out of caution, err on the side of inclusion: the provisions expressly being amended may be lost among those less directly affected, and few people will understand, without extensive explanation, how or how much a particular listed provision is being altered (MCL 168.482; MSA 6.1482).

11. ELECTIONS — INITIATIVE — PETITIONS — WORDS AND PHRASES — "ALTER OR ABROGATE".

Only where a proposed amendment to the Constitution would directly "alter or abrogate" ("amend or replace") a specific provision or provisions of the existing Constitution must those provisions be noted on the petitions proposing the amendment; an existing constitutional provision is altered or abrogated if the proposed amendment would add to, delete from, or change

the existing wording of the provision, or would render it wholly inoperative (MCL 168.482; MSA 6.1482).

12. ELECTIONS — INITIATIVE — PETITIONS — "ALTER OR ABROGATE".

The requirements of the Election Law for petitions proposing an amendment to the Constitution were met where the petitions which were circulated correctly notified the prospective signer of the provisions that the proposed amendment would directly "alter or abrogate"; provisions which will remain operative, though possibly they may need thereafter to be construed in conjunction with the amending provisions, are not required to be specified by the petitions (MCL 168.482; MSA 6.1482).

13. ELECTIONS — INITIATIVE — PETITIONS — ELECTION LAW — "ALTER OR ABROGATE".

It is not likely that the Legislature in promulgating the Election Law contemplated requiring a petition circulator proposing an amendment to the Constitution, in order to insure against subsequent judicial nullification of the effort, to secure judicial determination of which provisions of the existing Constitution the proposed amendment would "alter or abrogate" (MCL 168.482; MSA 6.1482).

14. ELECTIONS — INITIATIVE — PETITIONS — CERTIFICATION.

It would be manifestly unfair to hold that because the deadline has passed for certification by the Board of State Canvassers of petitions proposing an amendment to the Constitution, as required by the Constitution and the Election Law, the Court can afford no relief where the circulators of the petitions complied with constitutional dictates in filing the petitions, and the Board of State Canvassers attempted to fulfill its constitutional duties to certify them in a timely fashion, but was prohibited from doing so by an order of the circuit court (Const 1963, art 12, § 2; MCL 168.477; MSA 6.1477).

15. ELECTIONS — INITIATIVE — PETITIONS — CERTIFICATION.

The Court cannot tolerate a misuse of the judicial process which would encourage opponents of a proposal to amend the Constitution to try to keep it off the ballot by waiting until the last minute before the general election to challenge it (MCL 168.477; MSA 6.1477).

16. ELECTIONS — INITIATIVE — PETITIONS — CERTIFICATION.

The 60-day requirement for the certification before the general election of a proposed amendment to the Constitution initiated by petition does not relate to the sufficiency or validity of the petitions themselves; it is designed essentially to facilitate the

electoral process by giving the Secretary of State and county clerks enough time to print and distribute ballots, and to ready the voting machinery for election day (Const 1963, art 12, § 2; MCL 168.477; MSA 6.1477).

17. ELECTIONS — INITIATIVE — PETITIONS — CERTIFICATION.

The 60-day requirement for certification before the general election of a proposed amendment to the Constitution initiated by petition should not be used to prevent a proposal from appearing on the ballot where its proponents have done everything the Constitution requires of them, and only the most extreme circumstances prevented the timely certification of the petition (Const 1963, art 12, § 2; MCL 168.477; MSA 6.1477).

18. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — REFERENDUM.

The courts, in a long line of cases, have actively protected and enhanced the initiative and referendum power; constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed and their exercise should be facilitated rather than restricted (Const 1963, art 12, § 2).

19. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — "ALTER OR ABROGATE".

A circuit court erred in issuing an order requiring the Secretary of State to publish notice of certain additional provisions of the Constitution which a proposed amendment of the Constitution would arguably "alter or abrogate" where the petitions proposing the amendment specified all of the provisions which the proposed amendment would directly "alter or abrogate", if adopted (Const 1963, art 12, § 2).

20. CONSTITUTIONAL LAW — AMENDMENTS — SUPREME COURT — ADVISORY OPINIONS.

The Constitution is a cohesive document whose underlying principles and constituent parts are interrelated, so that proposed amendments are likely to affect the operation of a number of existing provisions; it is difficult to see how an assessment of a proposed amendment's effect could be definitively resolved short of an appeal to the Supreme Court, but it is hardly proper or practical for the Court to issue advisory opinions on the constitutional implications of every proposed amendment (Const 1963, art 12, § 2).

21. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION.

The people, in reserving to themselves the power to amend their Constitution through a self-executing process, cannot have

intended to require state election officials to make complex judgments which would require judicial imprimatur in order to establish that the election officials had properly performed their duties under the Constitution to publish existing provisions of the Constitution which would be "altered or abrogated" by a proposed amendment, if adopted (Const 1963, art 12, § 2).

22. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION.

The reasonable interpretation of what the people intended in requiring publication of the constitutional provisions that would be altered or abrogated by a proposed amendment is that the requirement contemplates the purely ministerial task of setting out the provisions expressly being altered (Const 1963, art 12, § 2).

23. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — WORDS AND PHRASES — "ALTER OR ABROGATE".

An existing constitutional provision is altered or abrogated so that it must be published by election officials if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative (Const 1963, art 12, § 2).

OPINION BY WILLIAMS, J.

24. ELECTIONS — CONSTITUTIONAL LAW — PETITIONS — PUBLICATION — "ALTER OR ABROGATE".

*There are different standards for determining whether a petition to be circulated and a proposed amendment to be published and put on the ballot contain provisions which would alter or abrogate provisions of the existing Constitution; the Secretary of State, the Director of Elections, and the Board of State Canvassers have a duty independent of that of the petition circulator to determine whether in the proposed amendment there are provisions which would "alter or abrogate" sections of the existing Constitution (Const 1963, art 12, § 2; MCL 168.482; MSA 6.1482).*

25. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PETITIONS.

*The framers of the Constitution wanted to make the process of initiative and referendum as freely available as possible, but they also wanted voters to have reasonable notice of the effect of a proposed constitutional amendment on existing provisions of the Constitution; if an average citizen without access to skilled legal counsel wishing to circulate an initiative petition had to supply exhaustive notice to inform a voter definitively, it*

*could well have a chilling effect on the exercise of the right of initiative or referendum (Const 1963, art 12, § 2).*

26. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PETITIONS — PUBLICATION.

*Comparison of the constitutional provisions for circulation of petitions proposing an amendment to the Constitution and publication of proposed amendments makes it clear that the Constitution intended that for the circulation of a petition there should be a certain standard as to form and signature; but for the publication of the proposed amendment a higher standard could be exacted, because this duty was to be performed by public officials with a particular competence in the matter (Const 1963, art 12, § 2).*

27. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — "ALTER OR ABROGATE".

*The Court should not ascribe to the Legislature an intention in the Election Law to shift the duty of authoritative determination whether the proposed amendment "alters or abrogates" provisions of the Constitution from the constitutionally designated election officials to the petition circulator; to do so would be to conclude more than the statutory words imply (Const 1963, art 12, § 2; MCL 168.482; MSA 6.1482).*

28. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — "ALTER OR ABROGATE".

*The appropriate election officials have the duty under the Constitution to determine whether the proposed amendment "alters or abrogates" provisions of the existing Constitution, but the Election Law cannot be construed to impose the same duty on the circulator as the Constitution imposes upon election officials in publication; while the statute has the same words, "alter or abrogate", as are used in the Constitution, the Legislature was using them in a different context and they should be interpreted in that different context to avoid an implication that the Legislature acted unconstitutionally to impose the same duty on the petition circulator as on the election officials (Const 1963, art 12, § 2; MCL 168.482; MSA 6.1482).*

29. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — "ALTER OR ABROGATE".

*The reason for the constitutional requirement to publish existing provisions of the Constitution which a proposed amendment will alter or abrogate is to inform the voter so he can vote intelligently on the proposal; to avoid confusion there need not*

*be publication of all the other constitutional provisions which might be remotely or contingently affected, but if the proposed provision amends or replaces a specific provision, that provision should be published, and other provisions which are still operative but which may need to be construed in conjunction with the amendatory provision need not necessarily be published (Const 1963, art 12, § 2).*

30. Elections — Constitutional Law — Initiative — Publication — "Alter or Abrogate".

*Precedent encourages the Supreme Court to use different eyeglasses in considering before an election whether existing provisions of the Constitution should be published with a proposed amendment to the Constitution from those it would use when sitting after an election; this probably means that the Court should 1) pay more attention to the intended purpose of publication, 2) credit the voter with more competence to cope with a number of altered provisions, 3) lean toward publication if there is any doubt whether a provision "amends or replaces", "alters or abrogates", 4) lean toward publication if there is any doubt whether a still operative provision should be published (Const 1963, art 12, § 2).*

31. Elections — Constitutional Law — Initiative — Referendum — Publication — "Alter or Abrogate".

*It is important for the voter to know that a proposed amendment to the Constitution would modify the constitutional rule that approval in a referendum is by a majority by requiring a 60% vote where a new or increased tax is involved; certainly any normal understanding of the terms "alter or abrogate" would indicate that the proposed amendment would do so by effectively inserting in a tax matter an exception of a 60% vote to the rule of a simple majority (Const 1963, art 2, § 9; art 12, § 2).*

32. Elections — Constitutional Law — Initiative — Publication — "Alter or Abrogate".

*Whether the alteration or amendment of existing provisions of the Constitution by a proposed amendment is direct or by implication makes no difference in the constitutional publication requirement because the purpose of these terms is to lay the foundation for giving the electors the necessary information; in case of doubt whether the modification is an "amendment", the Court should lean toward publication (Const 1963, art 12, § 2).*

33. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — REFERENDUM — PUBLICATION — "ALTER OR ABROGATE".

*A proposed amendment to the Constitution which would change the current constitutional provisions for initiative and referendum by denying the people the significant right to approve a new tax or increase an old one by a majority is an "alteration or abrogation" of the existing Constitution that must be brought to the attention of the people deciding to adopt the proposed amendment; taking away the right of the majority to exercise their will by initiative and referendum clearly would be an "alteration or abrogation" of the existing Constitution (Const 1963, art 2, § 9; art 12, § 2).*

34. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — "ALTER OR ABROGATE" — TAXATION — STATUTES.

*A proposed amendment to the Constitution which would prohibit the Legislature from exercising the power to tax in certain instances without affirmance by 60% of the electors clearly alters or abrogates existing provisions of the Constitution vesting the power to tax in the Legislature, controlling the procedure for enacting legislation, permitting the imposition of an excise tax on liquor sales by the Legislature, and specifying the effective date of legislative enactment; therefore those existing provisions should be published by the appropriate election officials (Const 1963, art 4, §§ 1, 27, 33, 34, 40; art 12, § 2).*

35. ELECTIONS — CONSTITUTIONAL LAW — INITIATIVE — PUBLICATION — "ALTER OR ABROGATE" — TAXATION — STATUTES.

*A proposed amendment to the Constitution which includes a novel and extensive definition of a "tax" but which applies only to new or increased taxes which are enacted by the Legislature does not "alter or abrogate" constitutional provisions concerning university controlling boards, judicial power, counties, cities or villages merely because their power to "tax" was originally derived from the Legislature (Const 1963, art 6, §§ 1, 4, 5; art 7, § 21; art 8, § 5; art 12, § 2).*

*Foster, Swift, Collins & Coey, P.C.* (by *Michael J. Schmedlen* and *Thomas A. Baird),* and *Zolton Ferency, in propria persona,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jann Ryan*

*Baugh* and *Robert C. Ward, Jr.,* Assistants Attorney General, for defendants.

*Reid, Reid & Mackay, P.C.* (by *Joseph D. Reid* and *Patrick R. Hogan),* for intervening defendant.

PER CURIAM. On September 4, 1980, the Ingham Circuit Court issued an order which, *inter alia,* stated:

"[T]his court declares the 'Tisch' proposal, and any and all such petitions filed with defendant Secretary of State are legally insufficient and that the said proposal is not entitled to placement on the ballot scheduled for the November, 1980, General Election."

The order further provided that the defendant Secretary of State, the defendant Director of Elections, and the defendant Board of State Canvassers were to take "no steps whatsoever to effectuate placement of such proposal on said ballot". Finally, the order provided that the defendant Board of State Canvassers was "enjoined and restrained from certifying for placement on the ballot the so-called 'Tisch' amendment".

The basis for the circuit court's ruling was its finding that the petitions which were circulated to gather signatures in support of the proposed constitutional amendment did not comply with the requirement of MCL 168.482; MSA 6.1482[1] in that

---

[1] "The size of all petitions mentioned in this section shall be 8-1/2 inches by 13 inches. If the measure to be submitted proposes a constitutional amendment, initiation of legislation, or referendum of legislation, the heading of each part of the petition shall be prepared in the following form and printed in capital letters in 14-point bold face type:

"INITIATIVE PETITION
"AMENDMENT TO THE CONSTITUTION
"OR
"INITIATION OF LEGISLATION
"OR

all existing provisions of the Constitution which the proposal would alter or abrogate were not set forth therein. Specifically, the circuit court found that the petitions did not include reference to Const 1963, art 2, § 9;[2] art 4, § 1;[3] art 4, § 33;[4] art 4,

---

"REFERENDUM OF LEGISLATION
"PROPOSED BY INITIATIVE PETITION

"The full text of the amendment so proposed shall follow, printed in 8-point type. If the proposal would alter or abrogate any existing provision of the constitution, the petition should so state and the provisions to be altered or abrogated shall be inserted, preceded by the words:

" 'Provisions of existing constitution altered or abrogated by such proposal if adopted.'

"We, the undersigned qualified and registered electors,
                          city
residents in the              (strike 1) of . . . . in the county of . . . . ,
                          township
state of Michigan, hereby respectively petition for said (amendment to constitution) (initiation of legislation) (referendum of legislation).

"Immediately above the place for signatures, on each part of the petition shall be printed in 12-point type the following warning:
                          "WARNING
"Whoever knowingly signs this petition more than once, signs a name other than his own, signs when not a qualified and registered elector, or sets opposite his signature on a petition, a date other than the actual date such signature was affixed, is violating the provisions of this act. The remainder of the petition form shall be as provided following the warning in section 544c."

[2] "**Initiative and referendum; limitations; appropriations; petitions.** Sec. 9. The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

"**Referendum, approval.** No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

"**Initiative; duty of legislature, referendum.** Any law proposed

by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature. If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

**"Legislative rejection of initiated measure; different measure; submission to people.** If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election. The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election.

**"Initiative or referendum law; effective date, veto, amendment and repeal.** Any law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote. No law initiated or adopted by the people shall be subject to the veto power of the governor, and no law adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature. Laws approved by the people under the referendum provision of this section may be amended by the legislature at any subsequent session thereof. If two or more measures approved by the electors at the same election conflict, that receiving the highest affirmative vote shall prevail.

**"Legislative implementation.** The legislature shall implement the provisions of this section."

[3] "**Legislative power.** Sec. 1. The legislative power of the State of Michigan is vested in a senate and a house of representatives."

[4] "**Bills passed; approval by governor or veto, reconsideration by legislature.** Sec. 33. Every bill passed by the legislature shall be presented to the governor before it becomes law, and the governor shall have 14 days measured in hours and minutes from the time of presentation in which to consider it. If he approves, he shall within that time sign and file it with the secretary of state and it shall become law. If he does not approve, and the legislature has within that time finally adjourned the session at which the bill was passed, it shall not become law. If he disapproves, and the legislature continues the session at which the bill was passed, he shall return it within such 14-day period with his objections, to the house in which it originated. That house shall enter such objections in full in its journal and reconsider the bill. If two-thirds of the members elected to and serving in that house pass the bill notwithstanding the objections of the governor, it shall be sent with the objections to the other house for reconsideration. The bill shall become law if passed by two-thirds of the members elected to and serving in that house. The vote of each

§ 34;[5] and art 4, § 40.[6] The circuit court found that each of the aforementioned constitutional provisions would be "altered or abrogated" if the proposed constitutional amendment were adopted.

Defendants Secretary of State, Director of the Elections Division of the Department of State and the Board of State Canvassers, as well as intervening defendant Tisch Coalition for Property Tax Cut in Michigan, Inc., filed claims of appeal, together with requests for ancillary relief, in the Court of Appeals. That same day, September 8, 1980, the defendants and intervening defendant sought leave to appeal to this Court prior to the decision of the Court of Appeals. By order dated September 10, 1980, we granted leave to appeal.

I

As early as 1918, it had been recognized by this Court that:

"Of the right of qualified voters of the State to propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises. But the right is

house shall be entered in the journal with the votes and names of the members voting thereon. If any bill is not returned by the governor within such 14-day period, the legislature continuing in session, it shall become law as if he had signed it."

[5] **"Bills, referendum.** Sec. 34. Any bill passed by the legislature and approved by the governor, except a bill appropriating money, may provide that it will not become law unless approved by a majority of the electors voting thereon."

[6] **"Liquor control commission; liquor tax; local option.** Sec. 40. The legislature may by law establish a liquor control commission which, subject to statutory limitations, shall exercise complete control of the alcoholic beverage traffic within this state, including the retail sales thereof. The legislature may provide for an excise tax on such sales. Neither the legislature nor the commission may authorize the manufacture or sale of alcoholic beverages in any county in which a majority of the electors voting thereon shall prohibit the same."

to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution."[7]

Const 1963, art 12, § 2 provides for the exercise of the right of popular amendment and describes the conditions imposed on that right.[8] This section

[7] *Scott v Secretary of State,* 202 Mich 629, 643; 168 NW 709 (1918).

[8] Const 1963, art 12, § 2 provides:

"**Amendment by petition and vote of electors.** Sec. 2. Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.

"**Submission of proposal; publication.** Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.

"**Ballot statement of purpose.** The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.

"**Approval of proposal, effective date; conflicting amendments.** If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail."

is self-executing—it does not depend upon statutory implementation.[9] And, as this Court has recently reaffirmed:

" 'It is settled law that the legislature may not act to impose additional obligations on a self-executing constitutional provision. *Soutar v St Clair County Election Commission,* [334 Mich 258; 54 NW2d 425 (1952)]; *Hamilton v Secretary of State,* [227 Mich 111, 125; 198 NW 843 (1924)]:

" ' " 'The only limitation, unless otherwise expressly indicated, on legislation supplementary to self-executing constitutional provisions is that the right guaranteed shall not be curtailed or any undue burdens placed thereon.' " ' "[10]

The rationale for making the right of popular amendment by initiative self-executing, and for judicial care in insuring that the Legislature does not unduly burden the exercise of the right, was

---

[9] Provisions for popular amendment in prior Michigan constitutions have been found self-executing. *Hamilton v Secretary of State,* 227 Mich 111; 198 NW 843 (1924); *Thompson v Secretary of State,* 192 Mich 512; 159 NW 65 (1916). While some of the legislation-like procedural detail was eliminated in the 1963 Constitution, much was retained with the express purpose of preserving the self-executing character. 2 Official Record, Constitutional Convention 1961, pp 2459-2460. See also *id.,* pp 2468-2469. The analogous provision for initiative legislation in Const 1963, art 2, § 9 was held self-executing in spite of the directive in that section, not present in Const 1963, art 12, § 2, that "[t]he legislature shall implement the provisions of this section". *Wolverine Golf Club v Secretary of State,* 384 Mich 461; 185 NW2d 392 (1971).

[10] *Wolverine Golf Club, supra,* p 466.

Although *Wolverine Golf Club* involved popularly initiated legislation under Const 1963, art 2, § 9, rather than, as here, popularly initiated amendments to the constitution under Const 1963, art 12, § 2, the principle that the Legislature may not unduly burden the self-executing constitutional procedure applies equally to both. As the quotation from *Hamilton v Secretary of State* immediately following in the text illustrates, both are procedures whereby the people reserved to themselves the power to directly change the law, constitutional or statutory, under which they live.

expressed in the lead opinion in *Hamilton v Secretary of State:*[11]

"The initiative found its birth in the fact that political parties repeatedly made promises to the electorate both in and out of their platforms to favor and pass certain legislation for which there was a popular demand. As soon as election was over their promises were forgotten, and no effort was made to redeem them. These promises were made so often and then forgotten that the electorate at last through sheer desperation took matters into its own hands and constructed a constitutional procedure by which it could effect changes in the Constitution and bring about desired legislation without the aid of the legislature. It was in this mood that the electorate gave birth to the constitutional provision under consideration. In view of this I am persuaded that it was not the intention of the electorate that the legislature should meddle in any way with the constitutional procedure to amend the State Constitution. It was fittingly said in the following cases that:

" 'A constitutional provision designed to remove an existing mischief should never be construed as dependent for its efficacy and operation on legislative will.' *Morley v Thayer,* 3 F 737 [CC D Mass, 1880]; *People v Rumsey,* 64 Ill 44 [1872]; *Brien v Williamson,* [8 Miss (7 How) 14 (1843)]."

The Constitution does not require that the petition set out existing provisions that will be altered or abrogated. The Constitution places the burden of publishing this information on the state, as a means of informing the voters.[12] The Legislature, apparently feeling it proper to extend the educational function of this requirement to persons signing petitions, has placed the burden on petitioners, allegedly pursuant to the constitu-

---

[11] *Hamilton v Secretary of State, supra,* p 130.

[12] Const 1963, art 12, § 2, ¶ 2.

tional provision that "[a]ny such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law".[13]

Assuming, *arguendo,* that a new requirement regarding substantive content is a regulation of form, and assuming that the Legislature can impose minimal burdens to keep the process fair, open and informed,[14] the burden imposed cannot unduly restrict the exercise of the right.

In construing the burden placed on petitioners by § 482, we are mindful that

"under a system of government based on grants of power from the people, constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed."[15]

Further, where, as here, there is doubt as to the meaning of legislation regulating the reserved right of initiative, that doubt is to be resolved in favor of the people's exercise of the right.[16]

## II

Historically, our interpretation of the words "alter or abrogate" has occurred in the context of the constitutional publishing requirement.

In *School Dist of Pontiac v Pontiac,* 262 Mich 338; 247 NW 474, 787 (1933), this Court was faced with a challenge to an amendment to the Constitution of 1908. The amendment was proposed by the requisite number of qualified electors, was submit-

---

[13] *Id.,* ¶ 1.

[14] See *State v Campbell,* 265 Or 82; 506 P2d 163 (1973), *app dis* 414 US 803 (1973).

[15] *Kuhn v Dep't of Treasury,* 384 Mich 378, 385; 183 NW2d 796 (1971).

[16] *State v Campbell, supra,* p 95.

ted at the November, 1932, election, and received the necessary votes for its adoption. Const 1908, art 17, § 3 provided:

"All proposed amendments to the constitution submitted to the electors shall be published in full, with any existing provisions of the constitution which would be altered or abrogated thereby, and a copy thereof shall be posted at each registration and election place. Proposed amendments shall also be printed together with any other special questions to be submitted at such election in full on a single ballot separate from the ballot containing the names of candidates or nominees for public office."

It was argued before this Court that the amendment which was approved by the electors altered or abrogated many other provisions of the Constitution and that the failure to publish those existing provisions nullified the attempted amendment.

In sustaining the validity of the amendment, this Court held:

"In determining what constitutes compliance with the constitutional requirement as to publication, a matter of prime importance is the purpose that prompted the people of the State of Michigan to include such a provision in the Constitution. All will agree that this was a means adopted by which it was believed the elector would be definitely advised as to the purpose of the proposed amendment and what provision of the constitutional law it modified or supplanted. Being so advised, the elector could intelligently determine whether his vote would be for adoption or rejection. But the ordinary elector, not being a constitutional lawyer, would be confused rather than helped by a publication of all the other constitutional provisions which were or might be directly or only remotely, and possibly only contingently, affected by the proposed amendment. We think the requirement in substance is this: That in case a proposed constitutional provision amends or replaces

('alters or abrogates') a specific provision of the Constitution, that such provision should be published along with the proposed amendment; that other provisions which are still operative, though possibly they may need thereafter to be construed in conjunction with the amending provision, need not necessarily be published." 262 Mich 338, 344.

The principles announced in *School Dist of Pontiac v Pontiac* were applied in the context of allegedly defective petitions in *City of Jackson v Comm'r of Revenue,* 316 Mich 694; 26 NW2d 569 (1947). In concluding that the constitutional amendment in that case should not be invalidated, this Court quoted with approval the language found in *School Dist of Pontiac v Pontiac.*

The case of *Carman v Secretary of State,* 384 Mich 443; 185 NW2d 1 (1971), is of little assistance to us since in that case the problem was that the petitions proposing the constitutional amendment made no mention of *any* existing language of the Constitution which would be "altered or abrogated" by the proposed amendment, although the express intent of the proposal was to amend art 8, § 2.

## III

We turn to a construction of the statutory requirement that the petition list existing provisions of the Constitution that it would "alter or abrogate". The Constitution is a broad, interrelated document composed largely of general principles of government rather than narrow, detailed requirements.

As interpreted by Ferency and the circuit court, § 482 conditions the right of initiative upon a correct assessment by the petitioner of the impact

the proposed amendment has on these general, interrelated principles. The task which this Court often finds so difficult is imposed on the petitioner, with the risk of a voided petition for an incorrect resolution. The difficulty, if not impossibility, of meeting this requirement is demonstrated by the history of this case. Ferency, himself an able attorney, identified at least seven *constitutional* provisions that would be altered by the proposed amendment. The circuit court identified at least five provisions, only one of which had been listed by Ferency. Doubtless, plausible arguments could be made that additional provisions will be altered.

Correctly interpreting the Constitution to identify all provisions affected by a proposed amendment is too onerous a burden to place upon the right of popular amendment. Nor can it be justified as a means of educating persons signing petitions. A petitioner faced with the prospect of having his or her entire petition drive nullified by the failure to list a constitutional provision will, out of caution, err on the side of inclusion. Petitions will become a maze of constitutional provisions, if indeed petitioners will not simply attach copies of the entire Constitution to their petitions. The provisions expressly being amended may be lost among those less directly affected. Few people will understand, without extensive explanation, how or how much a particular listed provision is being altered.

IV

We have examined the provisions of our Constitution which the plaintiff claims the proposed amendment would "alter or abrogate" if adopted, as well as those which the circuit court found would be "altered or abrogated" if the proposed

amendment were to be adopted. While we agree that virtually all of these provisions will, to one degree or another, be affected by the proposed constitutional amendment,[17] should it be adopted, we cannot conclude that any of these provisions would be "altered or abrogated".

We hold that it is only where the proposed amendment would directly "alter or abrogate" ("amend or replace") a specific provision or provisions of the existing Constitution that the provision or provisions must be noted on the petitions. An existing constitutional provision is altered or abrogated if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative. Here the petitions which were circulated notified the prospective signer that the proposed amendment would "alter or abrogate" present art 9, § 1, § 2, § 3 and § 31. We are persuaded that those are the provisions which the proposed amendment will directly "alter or abrogate" if the amendment is adopted.

In the language employed by this Court in *School Dist of Pontiac v Pontiac, supra,* the provisions cited by the plaintiff and by the circuit court, will remain "operative, though possibly they may need thereafter to be construed in conjunction with the amending provision[s]." See also *Graham v Miller,* 348 Mich 684, 694; 84 NW2d 46 (1957).

Since the petitions which were circulated clearly specified those provisions of the Constitution which the proposed amendment would directly "alter or abrogate" if the amendment were adopted, we hold that the requirements of MCL 168.482; MSA 6.1482 were met. To adopt a more expansive definition of the "alter or abrogate" requirement would

---

[17] See Appendix foldout following Justice WILLIAMS' opinion.

effectively require a petition circulator, in order to insure against subsequent judicial nullification of the effort, to secure a judicial determination of which provisions of the existing Constitution the proposed amendment would "alter or abrogate". We do not believe that such a state of affairs was contemplated by the Legislature in promulgating the statute.

V

Plaintiff argues that the instant controversy is moot because defendant Board of State Canvassers failed to certify the petition within 60 days of the general election as required by Const 1963, art 12, § 2 and MCL 168.477; MSA 6.1477.[18] We conclude that this contention is without merit.

This Court has previously confronted a claim concerning an analogous constitutional deadline and concluded, under seemingly similar circumstances, that the petition proponent was not entitled to relief. *Kuhn v Dep't of Treasury*, 384 Mich 378; 183 NW2d 796 (1971). The difference between the *Kuhn* case and the instant controversy helps explain our decision today.

In *Kuhn*, plaintiffs asked us to determine whether the Income Tax Act of 1967, MCL 206.1 *et seq.;* MSA 7.557(101) *et seq.*, was subject to the referendum power of the people. The facts in *Kuhn* reveal the following: Plaintiff Kuhn took no action while the courts deliberated. He did not collect any petition signatures within prescribed time limitations; nor did he invoke the emergency

---

[18] The implementing legislation differs slightly from the constitutional mandate in that it specifies that the board must certify the petition two months before the election rather than 60 days prior to the vote. Under the terms of either provision, the time for certifying the petition has passed in this case.

consideration of this Court. Further, before this Court could resolve the issue, the constitutional time limit, requiring that the petition process be completed within 90 days following the legislative session at which the target act was passed, had long expired.

Therefore, even though we ultimately decided that voters could approve or reject the Income Tax Act through their right of referendum, we gave plaintiff no relief. In explaining this result, we quoted with approval from Judge, now Justice, LEVIN's opinion in the Court of Appeals:

" 'In a case of this kind the moving party is entitled to an expeditious disposition by the courts so that the right of referendum guaranteed by the constitution is not jeopardized. The plaintiffs in this case obtained such an expeditious disposition at the trial court level.

" 'Their claim of appeal was filed October 19, 1967. No application for emergency consideration by our Court or for by-pass of our Court or for emergency consideration was filed with the Supreme Court.

" 'There is no provision in the constitution extending the time within which a referendum may be sought by reason of the pendency of litigation and *it would be extraordinary for the courts to declare such an extension of time.* If the plaintiffs desired to exercise the power of referendum they were obliged to proceed within the time provided by the constitution to obtain signatures. It is not claimed that any such effort was made. We conclude that the time for seeking a referendum on the income tax act has expired.' " (Emphasis added.) *Kuhn, supra,* 386-387.

This is the first time since *Kuhn* that we have faced a question involving a constitutional election deadline in the context of the initiative and referendum process. And because this case presents such unique circumstances, we must regard it as

justifying the extraordinary action referred to in *Kuhn.*

In contrast to *Kuhn,* intervening defendant Tisch Coalition complied with constitutional dictates. It collected the necessary petition signatures required to place the proposed amendment on the ballot. Further, the Coalition filed its petitions with the Secretary of State at the proper time, 120 days before the election. Const 1963, art 12, § 2.

Defendant Board of State Canvassers also attempted to fulfill its constitutional duties in a timely fashion. The board met on September 5, 1980, the last day for compliance with the certification deadline.

One of the items on the agenda, which defendant was fully prepared to address, was the question of certification of the proposed "Tisch" amendment. But at the same time, the board faced a September 4th circuit court order which prohibited it from taking any action on that same proposed amendment. The board resolved the dilemma by obeying the court order. Thereby the constitutional deadline passed.

Again in contrast to *Kuhn,* both defendants immediately filed an emergency appeal in this Court, bypassing the Court of Appeals. They did not sit back and wait for the judicial process to proceed according to its normal pace.

In essence, the facts in this case are almost the opposite of those in *Kuhn.* In *Kuhn,* the inaction of the plaintiffs who wished to invoke the referendum procedure created the delay. In the instant case, intervening defendant Tisch Coalition did everything the Constitution requires of it. Defendant board was ready to timely perform its constitutional duties, but was prohibited from doing so by the *active* intervention of the circuit court. In

other words, but for *court* interference, all the constitutional and statutory requirements for presenting the amendment to the voters on November 4 would have been met.

This Court has a tradition of jealously guarding against *legislative* and *administrative* encroachment on the people's right to propose laws and constitutional amendments through the petition process. *Wolverine Golf Club v Secretary of State,* 384 Mich 461; 185 NW2d 392 (1971). The question now is whether we will protect the process from *court* interference with procedural deadline requirements as well.

It would be manifestly unfair to hold that because the deadline has passed this Court can afford no relief. Such a decision would encourage opponents of a proposal to try to keep it off the ballot by waiting until the last minute to file a challenge in circuit court.[19] We cannot tolerate either such distortion of the initiative process or such misuse of the judicial process.

In addition, our holding is based on the nature of the constitutional requirement in issue. The 60-day requirement does not relate to the sufficiency or validity of the petitions themselves. We read the time limit as essentially designed to facilitate the electoral process by giving the Secretary of State and county clerks enough time to print and distribute ballots and ready the machinery for election day. See, *e.g., Wolverine Golf Club v Secretary of State,* 384 Mich 461; 185 NW2d 392 (1971). It should not be used to prevent a proposal

---

[19] This fear should not reflect on the actions of the parties in the instant case. Plaintiff Ferency cannot be faulted for the last-minute judicial intervention. On the contrary, he persistently challenged the proposal long before the 60-day deadline. Further, the lower court cannot be charged with undue delay. The learned trial judge acted as quickly as time would allow.

from appearing on the ballot when its proponents have done everything the Constitution requires of them.

This is not to say that the 60-day requirement may be circumvented as a matter of course. We do not suspend constitutional directory limits lightly. Only the most extreme circumstances, such as the last-minute active judicial intervention in the instant case, can justify this deviation.

Finally, our decision is consistent with a long line of cases in which the Michigan courts have actively protected and enhanced the initiative and referendum power. *Wolverine Golf Club, supra; Kuhn, supra; Newsome v Board of State Canvassers,* 69 Mich App 725; 245 NW2d 374 (1976). In effect, we simply repeat today what we have said before: "[C]onstitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed" and their exercise should be facilitated rather than restricted. *Kuhn, supra,* 385.

For the foregoing reasons, under the unique circumstances of this case, the expiration of the 60-day deadline does not preclude the certification of the proposed Tisch Amendment.

Accordingly, we reverse the judgment of the Ingham Circuit Court and we direct that the defendants proceed forthwith to attend to the duties prescribed in MCL 168.477; MSA 6.1477 and such other statutory duties as may follow thereon, observing, in each instance, to the maximum extent practicable, the time limits prescribed for the performance of such various duties.

No costs, a public question being involved.

COLEMAN, C.J., and KAVANAGH, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.

PER CURIAM. The instant case originated with a complaint filed in the Ingham Circuit Court in which the plaintiff requested the circuit court to rule that the defendants are obliged, pursuant to Const 1963, art 12, § 2,[1] to publish a notice that a proposed amendment to the Constitution (popularly known as the "Tisch amendment") would, if adopted, "alter or abrogate" existing provisions of the Constitution including, but not limited to art

[1] "Amendment by petition and vote of electors. Sec. 2. Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.

"Submission of proposal; publication. Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.

"Ballot, statement of purpose. The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.

"Approval of proposal, effective date; conflicting amendments. If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail."

2, § 9; art 4, §§ 27, 33, 34 and 40; art 6, § 4; art 7, §§ 2 and 21; and art 8, § 35.

On September 25, 1980 the Ingham Circuit Court issued an order which stated in pertinent part:

"Petition for declaratory relief having been filed by the plaintiff, acting in pro per; the court having heard arguments concerning the matter; the court having previously rendered an opinion in the case of *[Ferency v Secretary of State]*, File No. 80-25614-AA, in which the court found that the so-called 'Tisch' Amendment 'alters or abrogates' certain provisions of the 1963 Michigan Constitution, including, but not limited to art 2, § 9; art 4, § 1; art 4, § 33; art 4, § 34; and art 4, § 40, which finding is hereby specifically incorporated herein as though recited herein; the court having found further that the foregoing provisions, which would be 'altered or abrogated' by the 'Tisch' proposal if adopted, have not been published by the defendant Secretary of State or other defendants herein whereby copies of such publication shall be posted in each polling place and furnished to news media as required by art 12, § 2 of the Constitution and as provided by law; and the court being fully advised in the premises;

"Now therefore it is ordered and adjudged that the process for the publication of the 'Tisch' proposal as filed with the defendant agencies, together with the existing provisions of the state Constitution which would be altered or abrogated thereby as hereinbefore set forth shall commence as required by Constitution and law on or before Tuesday, September 30, 1980, at 4 p.m., except as hereinafter provided; and

"It is further ordered and adjudged that the defendants herein, and each of them, shall take such action as may be necessary to effectuate the publication of the 'Tisch' proposal and the existing provisions of the Constitution which would be altered or abrogated thereby as required by Constitution and law; * * *."

The defendants in this matter, represented by the Attorney General, filed a claim of appeal in

the Court of Appeals and at the same time asked
this Court to grant leave to appeal prior to a
decision of the Court of Appeals. On September 29,
1980 we granted leave to appeal pursuant to the
aforementioned request.

I

The position taken by the circuit court in this
matter is essentially consistent with and is a reaf-
firmation of a prior decision made by that court in
a previous lawsuit brought by the same plaintiff
against the same defendants. In the previous law-
suit the circuit court declared that the petitions
which were circulated in order to place the pro-
posed "Tisch amendment" on the ballot were "le-
gally insufficient" and thus were not entitled to be
placed on the ballot scheduled for the November
1980 general election. The rationale expressed by
the circuit court for its prior ruling was that the
petitions failed to satisfy the requirement of MCL
168.482; MSA 6.1482[2] that the petitions specify

---

[2] "The size of all petitions mentioned in this section shall be 8-1/2
inches by 13 inches. If the measure to be submitted proposes a
constitutional amendment, initiation of legislation, or referendum of
legislation, the heading of each part of the petition shall be prepared
in the following form and printed in capital letters in 14-point bold
face type:

"INITIATIVE PETITION
"AMENDMENT TO THE CONSTITUTION
"OR
"INITIATION OF LEGISLATION
"OR
"REFERENDUM OF LEGISLATION
"PROPOSED BY INITIATIVE PETITION

"The full text of the amendment so proposed shall follow, printed
in 8-point type. If the proposal would alter or abrogate any existing
provision of the constitution, the petition should so state and the
provisions to be altered or abrogated shall be inserted, preceded by
the words:

" 'Provisions of existing constitution altered or abrogated by such
proposal if adopted.'

and set forth therein any provisions of the existing Constitution which the proposed amendment, if adopted, would "alter or abrogate". The circuit court found the petitions to be defective because they failed to state that the proposed amendment, if adopted, would "alter or abrogate" Const 1963, art 2, § 9; art 4, § 1; art 4, § 33; art 4, § 34; and art 4, § 40. In that matter we also granted leave to appeal prior to decision by the Court of Appeals and on September 12, 1980 we issued an order which stated:

"This cause having been brought to this Court by appeal prior to the decision of the Court of Appeals and having been argued by counsel and due deliberation having been had thereon by the Court, it is hereby ordered that the judgment of the circuit court for the County of Ingham is reversed and the complaint filed in that court is dismissed. We are persuaded that the burdens imposed upon intervening defendant by the provisions of MCL 168.482 have been met.

"Defendants Secretary of State, Director of Elections and Board of State Canvassers are directed to proceed forthwith to attend to the duties prescribed in Const 1963, art 12, § 2 and MCL 168.477 [MSA 6.1477] and such other statutory duties as may follow thereon, observing, in each instance, to the maximum extent

---

"We, the undersigned qualified and registered electors,

　　　　　　　　　　city
residents in the　　　　　　(strike 1) of . . . . in the county of . . . . ,
　　　　　　　　　　township
state of Michigan, hereby respectively petition for said (amendment to constitution) (initiation of legislation) (referendum of legislation).

"Immediately above the place for signatures, on each part of the petition shall be printed in 12-point type the following warning:
　　　　　　　　　　"WARNING
"Whoever knowingly signs this petition more than once, signs a name other than his own, signs when not a qualified and registered elector, or sets opposite his signature on a petition, a date other than the actual date such signature was affixed, is violating the provisions of this act. The remainder of the petition form shall be as provided following the warning in section 544c."

practicable, the time limits prescribed for the performance of such various duties.

"Pursuant to GCR 1963, 866.3(c), the Clerk is directed to issue this judgment order forthwith. This judgment is final. The opinion of the Court will follow.

"No costs are to be taxed."

## II

We have, this day, issued an opinion in which we stated the reasons for concluding that the Ingham Circuit Court erred in ruling that the petitions which were circulated were "insufficient". We did so because we concluded that the petitions, in notifying the petition signers that the proposed amendment, if adopted, would "alter or abrogate" Const 1963, art 9, § 1, § 2, § 3 and § 31, satisfied the requirements of MCL 168.482; MSA 6.1482. We note that Const 1963, art 12, § 2 also requires the Secretary of State to publish those provisions of the existing Constitution which the proposed amendment would, if adopted, "alter or abrogate".

For the same reasons which we expressed in our opinion that the circuit court erred in finding the petitions to be "insufficient" we find that the circuit court erred in issuing its order in this case. The petitions specified all of the provisions of the existing Constitution which the proposed amendment would directly "alter or abrogate", if adopted, and thus the circuit court erred in ordering the defendants in this matter to give notice that other provisions of the existing Constitution, not specified in the petitions, would be "altered or abrogated" by the proposed amendment, if adopted.

The difficulty of determining which provisions

will be altered is the same for the state as for the petitioner. The risk that the voter will be confused by overinclusion and will lose sight of the provisions being directly amended among those indirectly affected on a publication posted at the polls, is at least as great as the risk that a prospective petition signer will be so confused.

To construe the phrase "altered or abrogated" more broadly in the constitutional context would inject a degree of uncertainty into the constitutional amendment process which could only be resolved by this Court.[3] Because the Constitution is a cohesive document whose underlying principles and constituent parts are interrelated, proposed amendments are likely to affect the operation of a number of existing provisions. Determining a proposal's effect upon an existing provision is likely to be an uncertain exercise for the Secretary of State and Attorney General. The more emphasis is placed on resolving doubts in favor of inclusion, the more diluted the informational effect of the publication will become.

Given the breadth and generality of our Constitution and the interrelation of its provisions, it is difficult to see how an assessment of a proposed amendment's constitutional impact could be definitively resolved short of an appeal to this Court. One can foresee challenges to the Secretary of State's selection of provisions to be published being brought not only by opponents of a proposal who

---

[3] The consequence of the state's failure to fulfill its obligations is not the same as follows from a like failure by the petitioner. The failure of the petitioner to meet constitutional obligations, at least where the challenge is brought prior to the vote, aborts the amendment effort. Such cannot be the result of the state's failure, since it seems clear that the people, in reserving to themselves the power to amend their Constitution through a self-executing process, cannot have intended the state to have the power to bring that process to naught through either inaction or erroneous action by its officials.

argue that other provisions should be included, but also by proponents who claim that overinclusiveness has exaggerated the impact of the proposal in question.

It is hardly proper or practical for this Court to issue advisory opinions on the constitutional implications of every proposed amendment. The people, in reserving to themselves the power to amend their Constitution through a self-executing process, cannot have intended to require state election officials to make complex judgments which would require judicial imprimatur in order to establish that the election officials had properly performed their duties under Const 1963, art 12, § 2.

The reasonable interpretation of what the people intended in requiring publication of the constitutional provisions that would be altered or abrogated by a proposed amendment is that the requirement contemplates the purely ministerial task of setting out the provisions expressly being altered.[4]

---

[4] Apparently the committee responsible for art 12, § 2 at the 1961-1962 Constitutional Convention considered requiring more, but chose instead the narrow obligation. Commenting upon the proposed Brown-Boothby substitute to art 12, § 2, which would have eliminated much of the procedural requirements set out in art 12, § 2, including the publishing requirement, Mr. Durst, a member of the committee, said:

"Now Mr. Brown completely eliminates those provisions and he eliminates almost all of what is contained on page 4 of the proposal, and here are some things which the committee also thought should be included for a good, self executing provision: one was that the state was required to publish the proposal along with setting forth *the material that it was expected to delete or change* and that this publication be listed in the polling places. There was considerable discussion that we should go further and require even the preparation of a pro and con pamphlet in order to educate the people. This was decided to be impractical and what is included here was thought to be *a minimum that was necessary,* that at least it should be set forth clearly and *concisely* and placed in the polling places and presented to the news media so there would be an opportunity for the people of this state to be thoroughly advised upon the amendment they are voting on." 2 Official Record, Constitutional Convention 1961, p 2467 (emphasis supplied).

We reaffirm for the state, as we have for the petitioner, the narrow publishing requirement set out in *School Dist of Pontiac v Pontiac,* 262 Mich 338, 344; 247 NW 474, 787 (1933):

"We think the requirement in substance is this: That in case a proposed constitutional provision amends or replaces ('alters or abrogates') a specific provision of the Constitution, that such provision should be published along with the proposed amendment; that other provisions which are still operative, though possibly they may need thereafter to be construed in conjunction with the amending provision, need not necessarily be published."

We further hold that an existing constitutional provision is altered or abrogated if the proposed amendment would add to, delete from, or change the existing wording of the provision, or would render it wholly inoperative.

Accordingly, we reverse the judgment of the Ingham Circuit Court.

No costs, a public question being involved.

Coleman, C.J., and Kavanagh, Levin, Fitzgerald, Ryan, and Blair Moody, Jr., JJ., concurred.

Williams, J. I concur that the *initiative petition*[1] for the proposed Tisch Amendment need not state or insert "any existing provision of the Constitution" beyond those already stated and inserted. However, I would hold that there are different standards determining whether on the one hand a petition to be circulated, (Const 1963, art 12, § 2, ¶ 1)[2] and, on the other hand, a proposed amendment

---

[1] See Appendix for a reproduction of the Tisch petition.

[2] Article 12, § 2, ¶ 1 states:

"**Amendment by petition and vote of electors. Sec. 2.** Amendments may be proposed to this constitution by petition of the regis-

to be published and put on the ballot, (art 12, § 2, ¶ 2)[3] contains provisions which would "alter or abrogate" provisions of the existing Constitution. As a consequence, I would hold that our order[4] heretofore issued in this matter, "Defendants Secretary of State, Director of Elections and Board of State Canvassers are directed to *proceed forthwith to attend to the duties prescribed in Const 1963, art 12, §2* and MCL 168.477 [MSA 6.1477] and such other statutory duties as may follow thereon" requires that the appropriate election authorities charged by art 12, § 2, ¶ 2 with seeing that "[s]uch proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law", shall be construed to mean that those authorities have a duty independent of that of the petition circulator to determine whether in the

tered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon."

[3] Article 12, § 2, ¶ 2 states:

"**Submission of proposal; publication.** Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law."

[4] Quoted *ante,* 409 Mich 606 (1980).

proposed amendment there are provisions which would "alter or abrogate" sections of the existing Constitution. I would further hold that the proposed Tisch Amendment does "alter or abrogate" existing provisions of the Constitution beyond those the proposed Tisch Amendment states and inserts.

## I. Analysis of Art 12, § 2 and MCL 168.482

The explanation for this seeming paradox lies in our analysis of the Constitution's solution to the dilemma posed by the initiative and referendum process. On the one hand, the framers of the Constitution wanted to make the process as freely available as possible to those who would wish to circulate a petition for initiative or referendum. On the other hand, they wanted voters to have reasonable notice of the impact of a proposed initiative or referendum on existing provisions of the Constitution.

If an average citizen without access to skilled legal counsel wishing to circulate an initiative or referendum petition had to supply exhaustive notice to definitively inform a voter, it could well have a chilling effect on the exercise of that right. This the framers of the Constitution did not want to do. However, they did want the people to have sufficient notice and information in order to exercise a proper judgment in voting.

The constitutional solution to this apparent dilemma is indicated in the construction of art 12, § 2. In that portion of § 2, ¶ 1 relating to the petition and its circulation appears this pertinent sentence:

"Any such petition shall be in the form, and shall be

signed and circulated in such manner, as prescribed by law."

In that portion of § 2, ¶ 2 relating to the "amendment proposed by such petition" after the petition had been circulated and the required signatures obtained appear these two pertinent sentences:

"Such proposed amendment, existing provisions of the constitution, which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law."

The comparison of these two parts of § 2 is pregnant. It is clear that the Constitution intended that, for the *circulation of a petition,* there should be a certain standard as to form and signature; but for the *publication* of the *proposed amendment* there was a different prescription and standard. The standard intended for the citizen *circulator* of a *petition* was to fit the purpose of the greatest possible freedom in the effective exercise of the right to petition by any citizen regardless of his sophistication in the intricacies of the Constitution. However, for the *publication* of the *proposed amendment* a higher standard could be exacted, because this duty was to be performed by public officials with a particular competence in the matter, assisted by government legal counsel including the Attorney General. In a word, the constitutional solution to the dilemma was to confront the petition circulator with a much easier standard than that imposed upon the public officials who have the competence to meet the higher requirements of publication. This would give the citizen

the requisite information when it was most important, when he voted.

In construing art 12, § 2 as I do I am faced with the fact that the Legislature in responding to this section of the Constitution not only prescribed the size of the petition, the language of the heading, the kind of type to be used, etc., but provided:

"If the proposal would alter or abrogate any existing provision of the constitution, the petition should so state and the provisions to be altered or abrogated shall be inserted." MCL 168.482; MSA 6.1482.[5]

---

[5] MCL 168.482; MSA 6.1482 states in full:

"The size of all petitions mentioned in this section shall be 8-1/2 inches by 13 inches. If the measure to be submitted proposes a constitutional amendment, initiation of legislation, or referendum of legislation, the heading of each part of the petition shall be prepared in the following form and printed in capital letters in 14-point bold face type:

"INITIATIVE PETITION

"AMENDMENT TO THE CONSTITUTION

"OR

"INITIATION OF LEGISLATION

"OR

"REFERENDUM OF LEGISLATION

"PROPOSED BY INITIATIVE PETITION

"The full text of the amendment so proposed shall follow, printed in 8-point type. If the proposal would alter or abrogate any existing provision of the constitution, the petition should so state and the provisions to be altered or abrogated shall be inserted, preceded by the words:

" 'Provisions of existing constitution altered or abrogated by such proposal if adopted.'

"We, the undersigned qualified and registered electors,

residents in the             (strike 1) of . . . . in the county of . . . . . ,

state of Michigan, hereby respectively petition for said (amendment to constitution) (initiation of legislation) (referendum of legislation).

"Immediately above the place for signatures, on each part of the petition shall be printed in 12-point type the following warning:

"WARNING

"Whoever knowingly signs this petition more than once, signs a name other than his own, signs when not a qualified and registered elector, or sets opposite his signature on a petition, a date other than the actual date such signature was affixed, is violating the provisions

The language of MCL 168.482 relating to the petition to be circulated employs the same "alter or abrogate" language as that found in art 12, § 2, ¶ 2 requiring the proposed amendment to be published and put on the ballot. This presents four decisional alternatives. First, the Legislature has intended to shift from the appropriate election officials to the petition circulator the duty of determining and announcing whether provisions of the proposed constitutional amendment would "alter or abrogate" existing provisions of the Constitution. Second, the Legislature has lawfully imposed the same duty on the petition circulator as upon the appropriate election officials to determine and announce those provisions of the proposal which would "alter or abrogate" existing provisions of the Constitution. Third, the Legislature has imposed the same duty unconstitutionally and the "alter or abrogate" language must be stricken. Fourth, the duty imposed by the Legislature upon the petition circulator, although using the same words as those found in art 12, § 2, ¶ 2, can be interpreted in light of the overall constitutional purpose to preserve that purpose while at the same time some meaning can be given to the legislative language as not being in conflict with the constitutional purpose.

With the exigencies imposed by the electoral schedule, and the necessity of announcing an opinion in time to comply therewith, it is impossible to extensively and definitively explore the legal ramifications of each of these alternatives. Suffice it to say, to begin with, that analysis of art 12, § 2 so far indicates that we should not ascribe to the Legislature an intention to shift the duty of au-

---

of this act. The remainder of the petition form shall be as provided following the warning in section 544c."

thoritative determination of whether the proposed
amendment "alters or abrogates" provisions of the
existing Constitution from the constitutionally des-
ignated election officials (art 12, § 2, ¶ 2) to the
petition circulator (MCL 168.482). To do so would
be to conclude more than the statutory words
imply. Further, the Court does lightly construe
legislation to change the Constitution.[6] As a conse-
quence I find the first alternative non-viable.

Once having made that decision, I need go no
further to choose between the second, third and
fourth alternatives, to hold that the appropriate
election officials have, under art 12, § 2, ¶ 2 the
duty to determine whether the proposed amend-
ment "alters or abrogates" provisions of the exist-
ing Constitution, for all three of these alternatives
recognize that constitutional duty. Consequently, I
would hold that the appropriate election officials
have that duty.

But in order to justify my concurrence with the
majority opinion that the petition circulated in
this case satisfied the requirements of MCL
168.482 I must consider the remaining three alter-
natives.

The second decisional alternative is that the
Legislature lawfully imposed the same duty on the
petition circulator as the Constitution had imposed
upon the appropriate election officials. I also reject
this alternative for reasons previously discussed.
My analysis of the Constitution is that it provides
freedom and flexibility in petition circulation so as

[6] In *City of Jackson v Comm'r of Revenue,* 316 Mich 694, 716; 26
NW2d 569 (1947), this Court addressed a similar situation, holding:
"Sections 2 and 3 of article 17, as amended in 1941, as well as Act No.
246, impose a duty on all of the above-named officials [Secretary of
State, Attorney General and State Board of Canvassers]. Sections 2
and 3 of article 17 were not superseded by Act No. 246, Pub Acts
1941, nor could they be. The Constitution cannot be amended or
superseded by legislation."

to encourage and not chill this important right. I also consider that the necessity to make an in-depth and authoritative determination whether the proposed amendment "altered or abrogated" existing constitutional provisions would chill the exercise of that right. As a consequence, I would hold the statute cannot be construed to impose the same duty on the circulator as art 12, § 2, ¶ 2 imposes upon the appropriate election officials in publication.

This leaves alternatives three and four for consideration. Alternative three implies that the Legislature acted unconstitutionally in imposing the same duty upon the petition circulator as upon the appropriate election officials to determine alteration or abrogation. While this is a possibility, using the same analysis I did with respect to alternative two, I would hold that such action by the Legislature will not be assumed, if there is another alternative.

That alternative is, of course, the fourth alternative, to wit, that while the Legislature employed in MCL 168.482 the same "alter or abrogate" words used by art 12, § 2, ¶ 2 the Legislature was using them in a different context and consequently they should be interpreted in that context. I adopt this alternative, which, of course, permits me to concur with the result reached by the majority.

## II. ANALYSIS OF PERTINENT PRECEDENT

The critical case in those cited to us is not *School Dist of Pontiac v Pontiac,* 262 Mich 338; 247 NW 474, 787 (1933), but *Carman v Secretary of State,* 384 Mich 443; 185 NW2d 1 (1971). *Carman* is not only the last word of this Court on the subject, it is more apposite for the following reasons. First, it construes the present 1963 Constitu-

tion, not the prior 1908 Constitution interpreted by *Pontiac*. Second, the fact situation in *Carman* is more on point. In *Carman,* as in the instant matter, the action was brought to court prior to submission of the proposed amendment to the voters —the petition was circulated without indicating any sections of the Constitution which would be altered or abrogated, although the Secretary of State published the text of the existing and proposed sections of the Constitution as required of him. In the instant case, the petitioner may or may not have indicated all the provisions of the Constitution which would be altered or abrogated, but the matter has been brought to court before the submission of the proposal to the electorate, giving the appropriate election officials an opportunity to publish such further provisions of the Constitution as would be "altered or abrogated". In *Pontiac* no action was brought prior to the election so the Secretary of State had no opportunity to consider what further provisions of the Constitution would be "altered or abrogated". *City of Jackson v Comm'r of Revenue,* 316 Mich 694; 26 NW2d 569 (1947), and *DeMaggio v Attorney General,* 300 Mich 251; 1 NW2d 530 (1942), like *Pontiac,* are cases where action was brought after the election, not before it when the Secretary of State or other appropriate election officials might act to remedy any defects in the petition process.

In *Carman,* plaintiffs brought an original action for mandamus in the Court of Appeals to force submission of an initiative proposal to amend the Constitution. There was absolutely no reference to the sections and no recitation of the text of provisions to be altered or abrogated. In an opinion jointly written by Judge HOLBROOK and now Justice FITZGERALD, the Court of Appeals held on

exclusively statutory grounds that the petition was sufficient and the question whether art 12, § 2 is self-executing was avoided on the principle that constitutional questions are not reached if a case can be decided on other grounds. 26 Mich App 403; 182 NW2d 563 (1970). The writ was granted, an appeal taken, and leave to appeal denied. However, after the proposal was adopted by the people, the Supreme Court did grant leave to appeal. The majority reached the same result as the Court of Appeals, but did so on what has been referred to as the "election-cures-error" doctrine.

The majority of this Court in *Carman* indicated three points of relevance to consideration of the instant matter:

1) That the discretional perimeters for decision as to compliance with procedural requirements are greater *before* the people have approved a provision in an election than *afterward*.

2) That the Secretary of State acting under art 12, § 2, ¶ 2 may, and did, in connection with publication, cure errors of omission by the circulator as to required reference and recitation of provisions of the existing Constitution to be "altered or abrogated".

3) That the standards for testing "altered or abrogated" are not the same for the circulation and publishing processes, and the test for publishing is more stringent.

As to the first point, that there is wider judgmental discretion before than after the initiative or referendum election, *Carman* analyzed *Jackson* and *Attorney General, ex rel Miller v Miller,* 266 Mich 127, 133; 253 NW 241 (1934), relied on by *Jackson,* to conclude that "the courts should look at procedural errors of submission through differ-

ent eyeglasses, once the electors have voted affirmatively". 384 Mich 443, 455.

As to the second point, that the action of the Secretary of State in remedying omissions of the circulator can satisfy constitutional requirements, *Carman* stated as follows:

"Our summarized ruling is that after this particular affirmative vote of the electors was certified, the quoted requirement of § 482 [MCL 168.482] became directory only, and that the requirement was fulfilled to constitutional satisfaction by the manner in which the Secretary of State performed his duty." 384 Mich 443, 456.

As to the third point, the variance in standards controlling the *circulator* and the *publisher, Carman* said:

"A thought of constitutional substance rather than form should be inserted here. It is that the constitutional purpose of the 'alter or abrogate' requirement of *publication,* set forth as it is in the second paragraph of § 2 of Article 12, is to assure as near as law can provide that, before and particularly *on* election day, *all voters* are fully informed of the *effect* an initiated proposal will have upon an existing constitutional provision (or provisions) should that proposal receive electoral approval. The Secretary of State satisfied that constitutional purpose when he saw to it that his published notice listed existing § 2 of Article 8 as liable to alteration or amendment.

"Comparing the above purpose with the salient requirement of the statute (§ 482), we find that the latter was intended to inform the *petition-signer,* should he sign, of that same *effect.* Both methods of dissemination of necessary information to the public are wholesome and desirable, yet the one that counts in controlling substance over the more technical other is that which the *elector himself*—not the petition-signer—receives by the separate action of the Secretary of State. Here the buttonholed petition-signers were *not* apprised pursuant

to § 482 of such *effect*, at least by the petition sheets themselves. But they, along with the far greater throngs of electors on election day, were directly notified—if they would but read—of that same *effect."* (Emphasis in original opinion.) 384 Mich 443, 454-455.

The lesson of *Carman* for the instant matter is that that decision would support us in doing three things: first, taking necessary action now, before, rather than after the election to respond to claimed failures to react to procedural requirements; second, assisting the appropriate election officials to take action required of them under art 12, § 2, ¶ 2 in publishing the amendatory proposal's alteration or abrogation of the existing Constitution; third, holding the circulator to a lesser standard of "alter or abrogate" than we would the publisher for the election, thereby sanctioning our acceptance of the petition but indicating to the appropriate election officials the necessity of recognizing certain other instances of alteration or abrogation.

The *Jackson* case involved primarily an effort of cities and school districts to enforce distribution of funds under the sales tax diversion amendment adopted by initiative. However, the validity of its adoption under the 1908 Constitution was challenged for failure to give notice. For our purposes, *Jackson* made two points: First, as indicated above, *Jackson* supports *Carman* that there is more judicial discretion before rather than after election in judging compliance with procedural requirements. *Jackson* is a post-election case. Second, in determining whether there was an alteration or abrogation, *Jackson* followed *Pontiac,* which I will consider next.

The *Pontiac* case was asked to interpret the 15-mill limitation amendment after its adoption by

the electors, and incidentally consider whether the
1908 constitutional equivalent of present art 12,
§ 2 was complied with. On the latter point, this
Court spoke as follows:

"In determining what constitutes compliance with
the constitutional requirement as to publication, a mat-
ter of prime importance is the purpose that prompted
the people of the State of Michigan to include such a
provision in the Constitution. All will agree that this
was a means adopted by which it was believed the
elector would be definitely advised as to the purpose of
the proposed amendment and what provision of the
constitutional law it modified or supplanted. Being so
advised, the elector could intelligently determine
whether his vote would be for adoption or rejection. But
the ordinary elector, not being a constitutional lawyer,
would be confused rather than helped by a publication
of all the other constitutional provisions which were or
might be directly or only remotely, and possibly only
contingently, affected by the proposed amendment. We
think the requirement in substance is this: That in case
a proposed constitutional provision amends or replaces
('alters or abrogates') a specific provision of the Consti-
tution, that such provision should be published along
with the proposed amendment; that other provisions
which are still operative, though possibly they may
need thereafter to be construed in conjunction with the
amending provision, need not necessarily be published."
*School Dist v Pontiac*, 262 Mich 344.

To accurately understand this paragraph it is
important to consider it *in toto* rather than just
the last line or two. Essentially it makes four
points.

1) The reason for the publication requirement
(now art 12, § 2, ¶ 2) is that "the elector * * * be
definitely advised as to the purpose of the proposed
amendment and what provision of the constitu-

tional law it modified or supplanted" so that he or she might vote intelligently.

2) To avoid confusion there need not be "publication of all the other constitutional provisions which [are] or might be directly or only remotely, and possibly only contingently, affected * * *".

3) "[I]n case a proposed constitutional provision amends or replaces ('alters or abrogates') a specific provision of the Constitution, that * * * provision should be published * * *".

4) "[O]ther provisions which are still operative, though possibly they may need thereafter to be construed in conjunction with the amendatory provision, *need not necessarily* be published". (Emphasis added.)

The quoted paragraph from *Pontiac* was heavily relied on by appellants. What weight should we assign it, and what does it mean?

First of all it relates to a post-election case, whereas the instant matter relates to a pre-election case. *Carman* and *Jackson* encourage us to use different eyeglasses before election from those we would use sitting where the *Pontiac* Court sat after election. This probably would mean we should:

1—pay more attention to the intended purpose of publication,

2—credit the voter with more competence to cope with a number of altered provisions,

3—lean toward publication if there is any doubt whether a provision "amends or replaces", "alters or abrogates",

4—lean toward publication if there is any doubt whether a "still operative provision" should be published.

While the question of "alteration or abrogation" will be considered in connection with each consti-

tutional provision affected, most of them have the same general problem as art 2, § 9, where the approval in a referendum election is by a majority. The proposed Tisch Amendment §§ 2 and 2(a) modify this rule by requiring a 60% vote where a new or increased tax is involved. In other words, any referendum is decided by majority vote, except one relating to a legislatively enacted new or increased tax, in which case the affirmation shall be by 60% vote.

Is such an exception "an alteration or abrogation"? Let us look to the four tests.

1) The intended purpose of the Constitution is to inform the voter so he or she can vote intelligently on the referendum. Is it important for the voter to know that in all instances except new or increased tax legislation, if there is a referendum, the voter can speak by a majority vote rather than a 60% vote? I believe the voter is entitled to this information.

2) Would the voter be confused by reference to six constitutional provisions which I believe the proposed Tisch Amendment would impact? I believe not.

3) *Pontiac* posits publication where the proposed constitutional provision "amends or replaces ('alters or abrogates') a specific provision of the Constitution". Does Tisch Amendment §§ 2 and 2(a) alter or amend art 2, § 9 by effectively inserting an exception of a 60% vote for a simple majority in case of a new or increased tax legislation referendum? Certainly any normal understanding of the terms alter or amend would so indicate. Whether the alteration or amendment is direct or by implication makes no difference because the purpose of these terms is to lay the foundation for necessary elector information. *Cf. Alan v Wayne County,* 388 Mich 210, 285; 200 NW2d 628 (1972).

4) In the case of doubt, although I see none, between whether the modification by exception is an "amendment" or a section still operative, though in need of construction with the amending provision, we should lean toward publication.

To sum up, the precedential cases either support my analysis or are compatible with it.

### III. DOES TISCH ALTER OR ABROGATE PER ART 12, § 2?

My analysis of art 12, § 2 is that the constitutional purpose is to allow maximum reasonable freedom to citizens in preparation and circulation of petitions, at least as to post-circulation review. On the other hand I read art 12, § 2 and the principal cases to indicate that information should be freely available for electors on election day, where that can be enforced prior to election. And finally outside of the possibility of egregious disregard of the constitution, after the electoral vote a policy of "election-cures-error" will prevail. In short, at this post-approved-circulation, pre-election day point in the electoral time table, the order of the day is to review petition information with great understanding and concentrate on any possible informational omissions in publishing that may be cured prior to election day.

We turn then to the following words from the *Pontiac* opinion:

"In determining what constitutes compliance with the constitutional requirement as to publication, a matter of prime importance is the purpose that prompted the people of the State of Michigan to include such a provision in the constitution. All will agree that this [the art 12, § 2, 1908 constitutional equivalent] was a means adopted by which it was believed the elector

would be definitely advised as to the purpose of the proposed amendment and what provision of the constitutional law it modified or supplanted." 262 Mich 338, 344.

The issue before us could be the narrow one, whether the "alter or abrogate" provision of MCL 168.482 relating to petition circulation was violated or the broader one whether art 12, § 2, ¶ 2 relating to publication was violated. If our decision were that MCL 168.482 were violated, we would in effect throw out the baby with the bath and negate the effort of 420,000 sincere petition signers. However, on the other hand, if we fail to examine whether art 12, § 2, ¶ 2 was violated relative to publication we jeopardize the ability of millions of electors to cast an intelligent ballot. Furthermore, because of the adopted "election-cures-error" doctrine, this is the people's last chance to have judicial determination as to the extent of information about the proposed Tisch Amendment that they are entitled to receive from the election officials.

In one sense the parties in this matter argued only the narrow statutory issue. In another sense they argued the broader constitutional issue as well. Insofar as the parties relied on such cases as *Pontiac, Jackson* and *Carman* they were considering the implication of the constitutional interpretation of alter or abrogate as regards *publication,* not *circulation.* For example, the language from *Pontiac, supra,* begins "In determining what constitutes compliance with the constitutional requirement as to *publication"* (emphasis added). *Publication,* of course, refers to post-petition circulation action and to art 12, § 2, ¶ 2, and not to MCL 168.482. *Jackson,* 316 Mich 694, 706-707, also considers *publication* and relies on *Pontiac. De-*

*Maggio,* 300 Mich 251, 256-257, also deals with *publication. Carman* distinguishes between *publication* and circulation and deals with art 12, § 2, ¶ 2. 384 Mich 443, 454.

In conclusion, since the electoral time table requires us to speak now or never and since the parties have consciously or unconsciously considered the question of "alter or abrogate" from the constitutional *publication* standpoint,[7] it is in the public interest for us to consider the broader constitutional issue so that those going to the polling booths may be informed.

To say that it does not "alter", or even stronger, "abrogate" the Michigan Constitution is to underestimate the revolutionary character of the Tisch Amendment and to do violence to the plain meaning of the English language.

The revolutionary intent and purpose of the Tisch proposal is best stated in the forthright language of the sponsor of the Tisch proposal himself, Robert Tisch. His clarion words under oath must be considered by every citizen of Michigan. They are:

"[T]he 'Tisch' Amendment presents a *substantial change* in the Michigan Constitution of 1963, if adopted, and, in addition thereto, would have *significant impact*

---

[7] We note in passing that the Solicitor General conceded to this Court during oral arguments that the Secretary of State, armed as he is with expert legal advice in construing the Constitution, is held to a higher standard under art 12, § 2. It is the constitutional duty of the Secretary to carefully review the effects of the proposed amendment on the Constitution and publish the "existing provisions of the Constitution which would be altered or abrogated thereby" by placing them on the ballot, posting them at each polling place and furnishing them to the news media. Const 1963, art 12, § 2, ¶ 2. This higher standard assures that the public will be made aware of the proposed amendment's scope and meaning before the critical time of voting, thereby lessening the import of requiring the circulator to attach a comprehensive list of "altered or abrogated" provisions to his petition.

*upon the operative affect [sic] of our form of government.*" (Emphasis added.)[8]

What is arresting and demands attention is that the author of the Tisch Amendment in this statement does not say that his proposed amendment would change the tax provisions of the Michigan Constitution but that the proposed amendment would have a "significant impact upon the operative affect *[sic]* of our form of government".

These words indicate an amendatory proposal far broader and more fundamental than the then-considered basic and far-reaching constitutional amendments such as the 15-mill and sales tax diversion amendments with which our previous principal opinions on the constitutionality of initiatory opinions have dealt. These words introduce an amendatory proposal which, unlike the 15-mill or the sales tax diversion amendment, is not limited to tax matters but which in the candid and carefully chosen words of the author and proponent of the proposal "impact * * * the operative affect *[sic] of our form of government".*

Was Robert Tisch only engaged in idle boasting, in predicting his authored amendatory proposal would impact not only the taxing power of the Constitution but the very "operative affect *[sic]* of our form of government" itself? Is this language idle boasting or is it indeed an honest and accurate appraisal of what the Tisch Amendment proposes? This is strong, powerful, revolutionary language more characteristic of forces in our society ' which would change our form of government than of those which would change our tax laws.

The fact of the matter is that in analyzing this

---

[8] Affidavit of Robert E. Tisch in Support of Circuit Court Motion to Stay, p 1, ¶ 3, September 5, 1980 (emphasis added).

case we ignore Robert Tisch's language at our peril. For he has "called it as it is". The Tisch Amendment does indeed "impact * * * the operative affect [sic] of *our form of government",* not merely the constitutional taxing power.

## A. Alterations Per Trial Judge

The trial court, Judge Giddings, has very carefully analyzed those provisions of the Constitution "impacted" beyond the article on taxation and there is no question but that the Tisch Amendment "alters or abrogates" sections of the Constitution other than those listed on the initiative petition as "altered or abrogated".

The learned trial judge held that the Tisch Amendment "altered or abrogated" the following sections of the Constitution:

Art 2, § 9. Initiative and referendum etc.

Art 4, § 1. Legislative power.

Art 4, § 33. Bills passed; approval by governor or veto etc.

Art 4, § 34. Bills, referendum.

Art 4, § 40. Liquor control commission; liquor tax etc.

I do not agree with the learned judge that MCL 168.482 was violated. I would, however, hold that with respect to each of the above mentioned sections, art 12, § 2, ¶ 2 was violated. I will examine these sections seriatim.

### Art 2, § 9 and Art 4, § 34

It takes no great effort or analysis to immediately see that one particular provision in both art 2, § 9 and art 4, § 34 has been "altered or abrogated".

Article 2, § 9 in pertinent part provides:

"No lȧw as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a *majority* of the electors voting thereon at the next general election." (Emphasis added.)

Article 4, § 34:

"Any bill passed by the legislature and approved by the governor, except a bill appropriating money, may provide that it will not become law unless approved by a *majority* of the electors voting thereon." (Emphasis added.)

The significant point in the above two sections of the Constitution is that whether a referendum is caused by popular initiative (art 2, § 9) or action by the Legislature (art 4, § 34), the people can exercise their will by a *majority* vote.

The Tisch Amendment would change all this. It would deny a majority of the people the significant right to approve a new tax or increase an old one. The denial of majority decision is effected by the proposed art 9, §§ 2 and 2(a) of the Tisch Amendment.

Proposed art 9, § 2 in pertinent part provides:

"The Legislature shall not impose any new * * * [or increased old tax] until such proposed tax or increased tax is first approved by affirmation of the electors * * *."

Proposed art 9, § 2(a) provides:

"Sixty (60) percent of the votes cast in favor of the question shall constitute affirmation."

It is not, of course, the office of this Court to

comment as to a policy of the people speaking in an election by a 60% vote as opposed to a majority vote, but it is clearly the office of this Court to determine whether the change is an "alteration or abrogation" of our existing Constitution that must be brought to the attention of the people deciding to adopt a proposed amendment. Taking away the right of the majority to exercise their will in initiative and referendum actions most definitely impacts "the operative affect *[sic]* of our form of government". That there has been an "alteration or abrogation" is as clear as the fact that if the proposed Tisch Amendment were adopted the people could no longer approve a tax increase or new tax by majority vote.

### *Article 4, § 1*

Article 4, § 1 provides:

"The legislative power of the state of Michigan is vested in a senate and house of representatives."

It is axiomatic that the Legislature has the power of the purse, *i.e.,* the power to tax and appropriate. Article 9, § 1 recognizes the Legislature's taxing and appropriating power in providing as follows:

"The legislature shall impose taxes sufficient with other resources to pay the expenses of state government."

Proposed Tisch Amendment art 9, § 2 in pertinent part provides:

"The legislature shall not impose any new [or increased old tax] until such proposed tax or increased

tax is first approved by affirmation of the electors
* * * ."

The existing Constitution vests the legislative
power, including the power to tax, in the Legisla-
ture. However, proposed Tisch, art 9, § 2, prohibits
the Legislature from exercising that power in
certain instances without affirmance of the elec-
tors, incidentally by 60% (proposed art 9, § 2[a]). In
effect, proposed art 9, §§ 2 and 2(a) "alter" or
amend art 4, § 1 to read as follows:

"The legislative power of the state of Michigan is
vested in a senate and house of representatives EXCEPT
THAT NEW OR INCREASED TAX LEGISLATION CAN BE EN-
ACTED ONLY WHEN FIRST APPROVED BY AFFIRMATION OF
THE ELECTORS."

Clearly, proposed Tisch art 9, §§ 2 and 2(a) "al-
ter or abrogate" a fundamental existing provision
of the Constitution, namely that the legislative
power is vested in a Senate and House of Repre-
sentatives, and I would so hold.[9]

*Article 4, § 33*

The analysis applied to art 4, § 1, can be utilized
with equal force to find art 4, § 33 has been
"altered or abrogated" by the proposed amend-
ment. That section provides:

---

[9] Section 3(f) likewise may alter Const 1963, art 4, § 1. It reads in
pertinent part:
"The Legislature shall not change, adjust or alter the state school
aid formula in effect for fiscal year 1980-81, or any fiscal year
thereafter, to diminish or reduce the yield in number of dollars per
mill per child in any school district of the state without approval, of
the governor and consent, by roll call vote, of 4/5ths of the members
elected to and serving in each house of the legislature."
However, since it was not covered in argument before us and since
it would call for the publication of the same provision we do not here
consider or rule on it.

"Every bill passed by the legislature shall be pre-
sented to the governor before it becomes law * * *. If
he approves, he shall within that time sign and file it
with the secretary of state and it shall become law."

With the advent of art 9, § 2 and 2(a), set forth
above, the process described would be augmented
by the additional step of voter affirmance when-
ever the bill involved imposition of new taxes or
changes in taxes extant in 1978. Once again, the
proposed amendment would essentially write in a
limitation phrase, curtailing the operation of this
section where tax matters are concerned.

Thus, art 4, § 33 is "altered or abrogated" by the
proposal, and must be published by the express
terms of art 12, § 2, ¶ 2.

### Article 4, § 40

In pertinent part, art 4, § 40 establishing a state
liquor control system, provides:

"The legislature may provide for an excise tax on
such sales."

It is obvious that the proposed Tisch Amend-
ment "alters or abrogates" this provision. Section
2 of the proposed Tisch Amendment provides in
part as follows:

"The legislature shall not impose any new tax * * *
until such proposed tax or increased tax is first ap-
proved by affirmation of the electors * * *."

As we have seen, existing art 4, § 40 provides:
"The legislature may provide for an excise tax on
such sales", but the proposed Tisch Amendment
provides "The legislature shall not impose any

new tax", and "tax" is defined to include "any money collected by the state", unless "first approved by affirmation of the electors". In other words art 4, § 40 is effectively "altered" to read: "The legislature may provide for an excise tax on such sales provided that if it is a new or increased excise tax it is first approved by an affirmation of the electors".

## B. Alterations Per Plaintiff

In the complaint filed in Ingham Circuit Court, plaintiff Zolton Ferency directed the court's attention to eight provisions of the 1963 Constitution which would be altered or abrogated by passage of the Tisch Amendment. The trial court agreed that art 4, § 34 was so impacted, but did not discuss the remaining provisions.

I find plaintiff's contentions as to this section, as well as to art 4, § 27, well-taken. However, I am in agreement with the trial court's implicit rejection of the following six additional sections:

Art 8, § 5. University controlling boards.

Art 6, §§ 1, 4, 5. Judicial power.

Art 7, § 2. County charters.

Art 7, § 21. Cities and villages.

### Article 4, § 27

Article 4, § 27 provides as follows:

"No act shall take effect until the expiration of 90 days from the end of the session at which it was passed, but the legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house."

Article 9, §§ 2 and 2(a), as proposed by the Tisch

Amendment, have already been quoted and discussed. The sections provide that the Legislature shall not impose any new or increased tax without the approval of a 60% majority in a referendum. It is obvious that such tax legislation, requiring approval of 60% of the voters in a referendum, will not have "immediate effect" or take effect upon the expiration of 90 days as now provided in art 4, § 27. As a consequence, with respect to tax legislation imposing a new or increased tax, existing art 4, § 27 would be non-operable if the Tisch Amendment passed. Therefore I find that the proposed Tisch provisions art 9, §§ 2 and 2(a) would "alter or abrogate" art 4, § 27.

## Other Sections

Plaintiff's rather cursory explanation of the alteration or abrogation of these sections contains a major analytical fault. In each instance, the potential alteration or abrogation is alleged because of the novel and extensive definition of "tax" of the proposed art 9, § 33(a):

" 'Tax' means any money collected by the state or any unit of local government to pay for any service or product performed or produced by the state or any unit of local government and shall be interpreted and construed as including any fee, levy, user charge, special assessment, license, permit, weight or volume tax or any imposition of any nature whatsoever to include appropriation to meet deficiencies in state funds. 'New tax' means any tax not devised, specified, indentified [sic] or titled and which is not in effect when this amendment is adopted."

Facially, this broad definition would seem to open a veritable Pandora's box of troubles and to have implications for the general supervisory power of

the judiciary and the controlling boards of the state universities, as well as the power to levy additional taxes granted to county charter commissions, cities, and villages.

However, the proposed amendment only requires electoral affirmance of new or increased "taxes" enacted by the Legislature. Proposed art 9, § 2 states:

"* * * The *legislature* shall not impose any new tax nor shall there be any increase in the rate of or any broadening of the base of any tax which was in effect during the calendar year 1978, until such proposed tax or increased tax is first approved by affirmation of the electors voting on the question at the next general election following the passage of the legislation proposing such tax or increased tax." (Emphasis added.)

By the terms of the proposed amendment, "affirmation" is necessitated only for new or increased taxes which are enacted by the *Legislature*. It is therefore erroneous to argue that provisions of the Constitution which—owing to the broadened definition of "tax"—potentially involve imposition of so-defined new or increased taxes by other bodies are subject to electoral approval. It would strain logic as well as the electoral system to find that, merely because the authority of municipal corporations to "tax" under the new definition was originally derived from the Legislature, new or increased old "taxes" are void unless approved by 60% affirmation of the electors.

As a consequence of this analysis, I would hold that the proposed Tisch Amendment does not alter or abrogate art 8, § 5, art 6, §§ 1, 4, 5, or art 7, § 21.

## Conclusion

I concur with the majority that the Tisch

Amendment petition was not invalid. However, my study of the Constitution and principal precedential cases convinces me that this moment of time, between the submission of the petition with the necessary number of signatures and the election, is extremely critical. It is the only practical time to test not only the sufficiency of the circulated petition but also the extent of notice that is required under Article 12, § 2, ¶ 2. It is the only practical time to test the sufficiency of the notice, since after election nothing effective can be done because of the "election-cures-error" doctrine.

It may be argued that now is not the time to test the sufficiency of the notice, because the appropriate election officials have not yet published their notice. It is true they have not published their notice, but they have effectively published what would be in the notice by the position they have taken in this matter. Their position is that the proposed Tisch Amendment does not alter or abrogate provisions of the existing Constitution that I believe are clearly altered or abrogated. This is particularly significant, because their arguments are based on cases relating to *publication,* not *circulation.* As a consequence, the *publication* notice issue as well as the circulation issue has effectively been argued. Then, too, the inexorable election schedule is such that election officials will not have, or will have inadequate, time to publish correctly if this Court does not speak now.

I conclude that *Carman* is the controlling case here, because it is the latest and it alone relates to facts similar to the instant case, *i.e.,* brought as a post-circulation, pre-election case, the other cited cases being exclusively post-election. I would hold therefore that the rule in *Pontiac* must be

modified accordingly and that equal emphasis must be given to the four factors in its oft-quoted test from page 262 Mich 344, rather than just the last one, where suit is brought before election. See *supra* 622.

I would hold therefore that art 12, § 2 differentiated between the notice requirements of petition circulation set forth in ¶ 1 and the notice requirements for publication by the appropriate election officials set forth in ¶ 2. I concur that the petition circulation requirements were met. I would hold that the publication requirements have not been met with respect to art 2, § 9, art 4, §§ 1, 27, 33, 34, 40.

No costs, a public question.